IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| AMANDA WOLTERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-1059-CV-W-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Amanda Wolters seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for disability benefits under the Social

Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to find that

plaintiff's mental impairments do not meet the requirements of List 12.04 - Affective

Disorders, and (2) failing to afford controlling weight to the treatment medical sources of

record. I find that the substantial evidence in the record as a whole does not support

the ALJ's decision. Therefore, plaintiff's motion for summary judgment will be granted

and the decision of the Commissioner will be reversed and remanded for an award of

benefits.

## I.    BACKGROUND

On January 7, 2011, plaintiff applied for disability benefits alleging that she had

been disabled since September 1, 1986, amended to August 31, 2008. Plaintiff's

disability stems from bipolar disorder, post traumatic stress disorder, attention deficit

disorder, generalized anxiety disorder, morbid obesity, and sleep apnea. Plaintiff's

application was denied on May 20, 2011. On July 19, 2012, a hearing was held before

an Administrative Law Judge.  On September 7, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On October 18, 2013, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5

(8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, her mother, and vocational expert Stella Doering, in addition to documentary evidence admitted at the hearing.

## A.    EARNINGS RECORD

<u>2007</u>

| | |
|---|---|
| Spamis Data Center Job Corps Pay | $ 284.70 |
| Happy Chef | 288.56 |
| Godfather's Pizza | 253.32 |
| City of Belton | 425.25 |

4

|  |  |
|---|---|
| Total | $ 1,354.83 |

2008

| Papas Partners | $ 220.25 |
|---|---|
| Coborns | 476.86 |
| Happy Chef | 449.38 |
| West Central Missouri Community Action Agency | 2,497.08 |
| Evangelical Lutheran Good Samaritan Society | 412.34 |
| Total | $ 4,319.87 |

2009

| Spencer Reed Group | $ 10.00 |
|---|---|
| West Central Missouri Community Action Agency | 814.63 |
| Salvation Army | 330.00 |
| Total | $ 1,154.63 |

2010

| Salvation Army | $ 88.00 |
|---|---|
| Total | $ 88.00 |

2011

| Total | $ 0.00 |
|---|---|

(Tr. at 197-199)

**B.    SUMMARY OF MEDICAL RECORDS**

The record in this case is voluminous.  Plaintiff has adequately summarized the medical records in her brief and I will not repeat that here.  However, I will highlight a

5

few records.

Plaintiff has been diagnosed with irritable bowel syndrome,[1] "very severe

obstructive sleep apnea,"[2] diabetes mellitus,[3] cardiomegaly,[4] tachycardia,[5] recurrent

---

[1]"Irritable bowel syndrome (IBS) is a common disorder that affects the large intestine (colon). Irritable bowel syndrome commonly causes cramping, abdominal pain, bloating, gas, diarrhea and constipation. IBS is a chronic condition that you will need to manage long term. . . . Only a small number of people with irritable bowel syndrome have severe signs and symptoms. Some people can control their symptoms by managing diet, lifestyle and stress. Others will need medication and counseling." http://www.mayoclinic.org/diseases-conditions/irritable-bowel-syndrome/basics/definition/con-20024578

[2]"Obstructive sleep apnea is a potentially serious sleep disorder in which breathing repeatedly stops and starts during sleep. Several types of sleep apnea exist, but the most common type is obstructive sleep apnea, which occurs when your throat muscles intermittently relax and block your airway during sleep. The most noticeable sign of obstructive sleep apnea is snoring. Anyone can develop obstructive sleep apnea, although it most commonly affects middle-aged and older adults and people who are overweight. Obstructive sleep apnea treatment may involve using a device to keep your airway open or using a mouthpiece to thrust your jaw forward during sleep. Some people undergo a procedure to change the structure of their nose, mouth or throat." http://www.mayoclinic.org/diseases-conditions/obstructive-sleep-apnea/basics/definition/con-20027941

[3]Diabetes mellitus (commonly referred to as diabetes) is a disease of the pancreas, an organ behind your stomach that produces the hormone insulin. Insulin helps the body use food for energy. When a person has diabetes, the pancreas either cannot produce enough insulin, uses the insulin incorrectly, or both. Insulin works together with glucose (sugar) in the bloodstream to help it enter the body's cells to be burned for energy. If the insulin isn't functioning properly, glucose cannot enter the cells. This causes glucose levels in the blood to rise, creating a condition of high blood sugar or diabetes, and leaving the cells without fuel. http://my.clevelandclinic.org/health/diseases_conditions/hic_Diabetes_Basics/hic_Diabetes_Mellitus_An_Overview

[4]"An enlarged heart (cardiomegaly) isn't a disease, but rather a symptom of another condition. The term 'cardiomegaly' most commonly refers to an enlarged heart seen on a chest X-ray. Other tests are then needed to diagnose the condition causing your enlarged heart. You may develop an enlarged heart temporarily because of a stress on your body, such as pregnancy, or because of a medical condition, such as the

6

cellulitis,[6] migraine headaches, hypertension, and morbid obesity (Tr. at 351-357,

439-440, 443, 446-447, 457-458, 461-462, 469-473, 478-479, 487-488, 574-576,

712-721, 1218-1222, 1230-1243, 1252-1258, 1267-1282, 1303-1304, 1312-1314, 1326,

1330-1333, 1335-1336, 1337-1340, 1346-1348, 1351-1356, 1358, 1360, 1362,

1384-1386, 1395-1398, 1406-1407, 1434-1435, 1442-1443, 1482-1484, 1498-1507,

1512-1514).

     Plaintiff has a long history of mental health problems and treatment.  She has

been diagnosed with Bipolar Disorder,[7] Attention Deficit Hyperactivity Disorder,[8] Post

_____

weakening of the heart muscle, coronary artery disease, heart valve problems or abnormal heart rhythms.  An enlarged heart may be treatable by correcting the cause. Treatment for an enlarged heart can include medications, medical procedures or surgery."
http://www.mayoclinic.org/diseases-conditions/enlarged-heart/basics/definition/con-200 34346

    [5]"Tachycardia is a faster than normal heart rate at rest.  A healthy adult heart normally beats 60 to 100 times a minute when a person is at rest.  If you have tachycardia the heart rate in the upper chambers or lower chambers of the heart, or both, is increased.  Heart rate is controlled by electrical signals sent across heart tissues.  Tachycardia occurs when an abnormality in the heart produces rapid electrical signals.  In some cases, tachycardia may cause no symptoms or complications. However, tachycardia can seriously disrupt normal heart function, increase the risk of stroke, or cause sudden cardiac arrest or death."
http://www.mayoclinic.org/diseases-conditions/tachycardia/basics/definition/con-200430 12

    [6]"Cellulitis is a common, potentially serious bacterial skin infection. . . .  Cellulitis may affect only your skin's surface, or cellulitis may also affect tissues underlying your skin and can spread to your lymph nodes and bloodstream.  Left untreated, the spreading infection may rapidly turn life-threatening."
http://www.mayoclinic.org/diseases-conditions/cellulitis/basics/definition/con-20023471

    [7]"Bipolar disorder -- sometimes called manic-depressive disorder -- is associated with mood swings that range from the lows of depression to the highs of mania.  When you become depressed, you may feel sad or hopeless and lose interest or pleasure in

7

Traumatic Stress Disorder,[9] Generalized Anxiety Disorder,[10] and Cluster B Personality

most activities.  When your mood shifts in the other direction, you may feel euphoric and full of energy.  Mood shifts may occur only a few times a year, or as often as several times a day.  In some cases, bipolar disorder causes symptoms of depression and mania at the same time. . . .  [Bipolar disorder is a disruptive, long-term condition. . . .]"
http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/definition/con-200 27544

[8]"Attention-deficit/hyperactivity disorder (ADHD) is a chronic condition that affects millions of children and often persists into adulthood.  ADHD includes a combination of problems, such as difficulty sustaining attention, hyperactivity and impulsive behavior. Children with ADHD also may struggle with low self-esteem, troubled relationships and poor performance in school.  Symptoms sometimes lessen with age.  However, some people never completely outgrow their ADHD symptoms.  But they can learn strategies to be successful.  While treatment won't cure ADHD, it can help a great deal with symptoms.  Treatment typically involves medications and behavioral interventions." http://www.mayoclinic.org/diseases-conditions/adhd/basics/definition/con-20023647

[9]"Post-traumatic stress disorder (PTSD) is a mental health condition that's triggered by a terrifying event -- either experiencing it or witnessing it. Symptoms may include flashbacks, nightmares and severe anxiety, as well as uncontrollable thoughts about the event.  Many people who go through traumatic events have difficulty adjusting and coping for a while, but they don't have PTSD -- with time and good self-care, they usually get better.  But if the symptoms get worse or last for months or even years and interfere with your functioning, you may have PTSD.  Getting effective treatment after PTSD symptoms develop can be critical to reduce symptoms and improve function." http://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/basics/def inition/con-20022540

[10]"It's normal to feel anxious from time to time, especially if your life is stressful. However, excessive, ongoing anxiety and worry that interfere with day-to-day activities may be a sign of generalized anxiety disorder.  It's possible to develop generalized anxiety disorder as a child or an adult. Generalized anxiety disorder has symptoms that are similar to panic disorder, obsessive-compulsive disorder and other types of anxiety, but they're all different conditions.  Living with generalized anxiety disorder can be a long-term challenge.  In many cases, it occurs along with other anxiety or mood disorders.  In most cases, generalized anxiety disorder improves with medications or talk therapy (psychotherapy). Making lifestyle changes, learning coping skills and using relaxation techniques also can help."
http://www.mayoclinic.org/diseases-conditions/generalized-anxiety-disorder/basics/defin ition/con-20024562

8

Traits.[11]  Plaintiff has been hospitalized numerous times because of these conditions despite her treatment.

She was hospitalized at Two Rivers Psychiatric Hospital from December 11, 2009, through December 19, 2009, when she was discharged with a guarded prognosis. The treating doctor noted that he was well familiar with plaintiff due to her numerous previous hospitalizations at that facility.

She was hospitalized at Two Rivers again from February 26, 2010, through March 5, 2010.  "She shows significant Cluster-B personality pathology with marked difficulty dealing with psychosocial stressors and issues in her life."  "She has severe bipolar disorder, posttraumatic stress disorder, as well as severe Axis II personality pathology of the mixed cluster B".  Plaintiff had been at Two Rivers for inpatient treatment three times in 2009 and one other time earlier in 2010.  She had been diagnosed with bipolar mood disorder and borderline personality disorder.  Her GAF on discharge was 40.[12]

Plaintiff was at Research Psychiatric Hospital from April 12, 2010, through April 15, 2010 (Tr. at 731-738).  On discharge she continued to be overwhelmed and

---

[11]Cluster B is called the dramatic, emotional, and erratic cluster.  It includes Borderline Personality Disorder, Narcissistic Personality Disorder, Histrionic Personality Disorder, and Antisocial Personality Disorder.  Disorders in this cluster share problems with impulse control and emotional regulation.

[12]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

pessimistic and her GAF was 30.[13]

From September 11, 2010, through September 17, 2010, plaintiff was a patient at Two Rivers Psychiatric Hospital (Tr. at 626-630). Insight and judgment were poor. She was placed on suicidal and assaultive precautions.

From January 13, 2011, through January 20, 2011, plaintiff was a patient at Two Rivers Psychiatric Hospital after attempting suicide (Tr. at 608-618). On discharge she was diagnosed with post traumatic stress disorder, bipolar mood disorder, severe mixed cluster-B personality disorder, status post suicide attempt via overdose, and a GAF of 40.

From February 8, 2011, plaintiff was admitted to inpatient treatment at the eating disorder clinic at Research Medical Center (Tr. at 1395-1401). On admission, plaintiff weighed 404 pounds and admitted to severe caloric binges. She reported that she feels that she has no control over her eating and had been binge eating since she was in kindergarten. Plaintiff's GAF on admission was 20-25.[14] Plaintiff required supplemental oxygen while at Research. By the end of the month plaintiff was still 402 pounds (Tr. at 1360).

---

[13]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

[14]A global assessment of functioning of 11 to 20 means some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces)
or gross impairment in communication (e.g., largely incoherent or mute).

On March 1, 2011, plaintiff underwent a sleep study at Research Belton Hospital (Tr. at 1406-1407).  She was found to have very severe obstructive sleep apnea-hypopnea syndrome and her doctor reported that her apnea-hypopnea index was the highest he had ever seen in his practice.

On March 22, 2011, plaintiff was admitted as an inpatient at Research Psychiatric Center until March 24, 2011, for increased anxiety attacks and suicidal ideations (Tr. at 722-730).  Plaintiff was sleeping excessively, could not concentrate, had mood instability, and was overwhelmed.  On admission, her GAF score was 28.  In addition, a CT of her chest indicated atypical pneumonia and diffuse fatty infiltration of her liver (Tr. at 1417).  Plaintiff's doctors believed that a group home placement for her should be considered.

On June 20, 2011, plaintiff was admitted as an inpatient at St. Luke's Hospital after an overdose, until her discharge on June 24, 2011 (Tr. at 704-709).  Plaintiff was initially very guarded and uncooperative and reported increased depression and stress. She was very demanding and hostile during her hospitalization and wanted to transfer to Research Medical Center; however, when the ambulance came to get her she refused to go.  She refused to participate in group therapy and did not want to take her medications.  Plaintiff's condition did not improve during her hospital stay.

On June 25, 2011, plaintiff was admitted as an inpatient for two days at Research Medical Center following an attempted suicide by overdosing on Seroquel[15] (Tr. at 777-779, 1426-1431).  Plaintiff was noted to have a long history of chronic

---

[15]Treats bipolar mood disorder, schizophrenia, and depression.

psychiatric problems including a borderline personality and self cutting. Plaintiff was transferred to Research Psychiatric Hospital until July 1, 2011, for additional intensive treatment and medication management (Tr. at 712-721). Plaintiff was noted to be actively hopeless, helpless, demoralized, and pessimistic of her future. She was socially isolated with diminished attention, concentration, and short-term memory. In addition, she was having significant difficulty with insomnia. During her hospitalization, plaintiff rated her suicidal ideations as severe. Her GAF was 29.

On July 9, 2011, plaintiff presented to the emergency room at Research Belton Hospital with a transient altered mental state (Tr. at 1432-1433).

On August 14, 2011, plaintiff was admitted as an inpatient for three days at Two Rivers Psychiatric Hospital (Tr. at 741-760). Plaintiff reported having been raped a few days earlier and was overwhelmed, depressed, anxious, and having difficulty sleeping. She gradually improved during her hospital stay and was released with diagnoses of bipolar mood disorder, post traumatic stress disorder, and borderline personality disorder.

On October 23, 2011, plaintiff presented to the emergency department at Research Medical Center following an intentional drug overdose (Tr. at 1456-1457). After she was medically stabilized, plaintiff was transferred for inpatient psychiatric treatment until November 1, 2011 (Tr. at 780-790).

On November 3, 2011, plaintiff was readmitted to Research Psychiatric following another overdose (Tr. at 764-776, 1459-1476). Plaintiff remained inpatient until November 11, 2011.

On December 24, 2011, plaintiff was admitted as an inpatient at Research Belton Hospital until December 28, 2011, with left lower lobe pneumonia, poorly controlled diabetes, hypertension, obesity, obstructive sleep apnea, and bipolar disorder (Tr. at 1303-1304, 1312-1314, 1484).

On February 1, 2012, plaintiff was transferred from Research Belton Hospital to Research Psychiatric following an overdose of Loxapine[16] (Tr. at 921-994, 1285-1289). Plaintiff appeared to be manic on admission; therefore, her Cymbalta and Celexa[17] were discontinued; however, this medication change made her manic symptoms worse. During her nine-day hospital stay, plaintiff was eventually titrated to Lithium[18] which appeared to be effective. In addition to Lithium, plaintiff was prescribed Zyprexa[19] because during her hospital stay she began responding to internal stimuli and hallucinating. Abilify[20] was added as a mood stabilizer and Ativan was used for anxiety. On discharge, plaintiff was diagnosed with bipolar disorder, most recent episode, mixed, severe; post traumatic stress disorder, chronic; and borderline personality disorder.

On February 12, 2012, plaintiff presented to Research Belton Hospital with shortness of breath (Tr. at 1267-1282, 1442-1443). On admission, plaintiff was in

---

[16]Treats schizophrenia and symptoms of mental disorders.

[17]Both Cymbalta and Celexa treat depression.

[18]Treats mania that is part of bipolar disorder.

[19]Treats psychotic mental disorders such as schizophrenia or bipolar disorder.

[20]Treats schizophrenia, bipolar disorder, and depression.

13

respiratory distress and required two liters of oxygen per minute at rest and four liters of oxygen per minute at activity. Plaintiff was diagnosed with acute bronchitis and acute respiratory failure complicated by morbid obesity, hypertension, and diabetes. Plaintiff was discharged three days later, on February 15, 2012.

On March 23, 2012, plaintiff was admitted as an inpatient until March 29, 2012, at Research Psychiatric following an attempted suicide on a combination of Benadryl[21] and Lithium (Tr. at 1074-1107, 1109-1212). On discharge, plaintiff agreed to attend a partial day program three days a week and go back to the Lilly Center[22] for two days per week (Tr. at 916).

On April 2, 2012, plaintiff met with her community support worker at Pathways and reported that she still gets mad at her mom when she reminds plaintiff to take her medication (Tr. at 918-919).

On April 5, 2012, plaintiff's mother contacted plaintiff's community support worker to find out if she had been attending her group therapy (Tr. at 793). Plaintiff's mother discussed that her daughter was hanging out with a man who has a warrant out for his arrest for rape. Plaintiff's mother said she was overwhelmed by trying to take care of her daughter and she could not continue.

On May 7, 2012, plaintiff presented to the emergency department at Research Belton Hospital with a blood sugar reading in excess of 500 (Tr. at 1230).

---

[21]Antihistamine.

[22]I have been unable to find more information on the Lilly Center but it appears to be another form of mental health treatment.

14

On May 8, 2012, plaintiff was seen by Dr. Hassan at Pathways (Tr. at 794-796). Plaintiff was currently living with her mother who was keeping her medications locked up to prevent plaintiff from attempting an overdose.

This is just a small representative sample of plaintiff's medical records -- she had hundreds of doctor and hospital visits for her mental condition, diabetes, migraine headaches, shortness of breath, lumps, rashes, and infections.

## C.    SUMMARY OF TESTIMONY

During the July 19, 2012, hearing, the following witnesses testified:  Plaintiff, her mother Bethany Wolters, and vocational expert Stella Doering.

## 1.    Plaintiff's testimony.

Plaintiff is 5' 5" tall and has weighed between 328 and 415 pounds since her alleged onset date (Tr. at 32).  Plaintiff lives in the basement of her mother's four-bedroom house (Tr. at 34).  She has to go up stairs to get to a bathroom (Tr. at 35). Plaintiff graduated from high school in 2004 after attending an alternative school with special education classes (Tr at 36).  There were four people in her graduating class (Tr. at 36).  Plaintiff tried to take classes to be a massage therapist but she was unable to pass the classes on anatomy and physiology after trying three times (Tr. at 38).  She never got to the part of the training course where she would actually deal with people in a massage setting (Tr. at 37-38).  Plaintiff then tried to get some training in the Job Corps but she either quit or was kicked out, she could not remember which (Tr. at 38). She got through the basic reading test but could not pass the basic math (Tr. at 38).

15

Plaintiff has been supported by her mother who is a chemist for the dairy division of the USDA (Tr. at 39). Plaintiff gets $200 per month in food stamps and is covered under her mother's health insurance (Tr. at 40). Plaintiff worked part time for a few months in 2008 and 2009 as a substitute teacher for Head Start (Tr. at 41-42). Plaintiff lost that job because she went into the hospital and her employer considered her terminated because she did not give notice (Tr. at 42-43). Plaintiff went to vocational rehabilitation in 2006 and 2007 but they found her unemployable (Tr. at 47).

At the time of the hearing, plaintiff was taking Lamictal (mood stabilizer), Abilify,[23] Cymbalta (treats depression), and Seroquel[24] (Tr. at 48). Despite taking her medication, plaintiff still experiences symptoms, just not as bad (Tr. at 49). She has a lot of breakthrough anxiety and she still has mood swings associated with bipolar disorder (Tr. at 49). Cymbalta causes her to be dizzy (Tr. at 49). When plaintiff is depressed, she does not take care of her personal grooming (Tr. at 50).

Plaintiff's only family member who lives nearby is her mother, all others are out of state (Tr. at 55). She doesn't get along well with her mother because "she's just fed up having to deal with my mental health issues because I put her through a lot. And on my part it's because I feel that she kind of attacks me sometimes verbally about being sick and tired of it." (Tr. at 55).

Plaintiff has had a caseworker through Pathways since she was 19 (Tr. at 60). Her first caseworker helped her try to plan healthy meals and help her try to get her life

---

[23]Treats schizophrenia, bipolar disorder and depression.

[24]Treats schizophrenia, bipolar disorder and depression.

in order (Tr. at 60). Her current caseworker just talks to her for about 30 minutes, just to check in -- she has a big caseload (Tr. at 60). Plaintiff would like to have more contact with her caseworker if she could provide it (Tr. at 61).

Plaintiff cannot really tell when she is entering a manic phase, but people who know her can tell (Tr. at 61). One time plaintiff sold everything she owned without thinking things through and got in major trouble (Tr. at 61). When plaintiff is in a depressive mood, she becomes reclusive and does not want to talk to anyone, she doesn't want to bathe or take care of herself (Tr. at 62). She has more depressive moods than manic (Tr. at 62). Whenever plaintiff feels like someone is attacking her, she becomes suicidal because she sees that as a way out, or a payback (Tr. at 62). Plaintiff is very impulsive with money (Tr. at 63).

Plaintiff tried to get treatment for her eating disorder but she was told she needed to get her other mental health issues resolved before she could address her eating (Tr. at 63). She has been diagnosed with "damage eating disorder" (Tr. at 63).

## 2. Plaintiff's mother's testimony.

Bethany Wolters, plaintiff's mother, testified that plaintiff has lived with her for the most part (Tr. at 64-65). She has lived for brief periods with friends, and she has spent some time in various homeless shelters (Tr. at 65). She seemed to be unable to follow the rules in the shelters so she was asked to leave (Tr. at 65). She spent several months in homeless shelters and then was hospitalized again (Tr. at 65). The people at Two Rivers Psychiatric Hospital told Ms. Wolters that they did not know what to do with plaintiff and were unable to advise Ms. Wolters on what to do with plaintiff (Tr. at 66).

When Ms. Wolters leaves for work, she leaves a written list of things for plaintiff to accomplish that day (Tr. at 67). Plaintiff never completes everything on the list, and the things that she does are not well done (Tr. at 67). Ms. Wolters continues to leave plaintiff a list because she believes plaintiff needs to have something to do during the day and as a member of the household she needs to participate in helping out to the best of her ability (Tr. at 67).

Plaintiff takes her medications as prescribed when she is living with her mother (Tr. at 67-68). They have an agreement that plaintiff will take her medication in front of her mother, and she takes it twice a day (Tr. at 68). Despite taking her medication regularly as directed, plaintiff continues to have mental health issues (Tr. at 68). She has attention deficit disorder symptoms and borderline personality disorder symptoms (Tr at 68). She can't take medication for ADD because when she tried that in the past, she had psychotic episodes and she developed schizoid tendencies and became violent (Tr. at 69). There are no medications for borderline personality disorder (Tr. at 69).

Plaintiff uses a breathing machine for her sleep apnea, but she hasn't slept less since she started using it (Tr. at 72). She has been trying for two years to use different types of breathing machines (Tr. at 72-73). Plaintiff was in the eating disorders unit of the hospital in 2011 and a nurse told plaintiff's mother that plaintiff was very easily winded and could not even walk down the hallway without gasping for breath (Tr. at 73). Her breathing has improved somewhat since she started using the CPAP (Tr. at 73). Plaintiff has lost weight over the past year only because of health problems (Tr. at 74).

18

She was having unexplained diarrhea and vomiting, and she was eventually diagnosed with bile reflux (Tr. at 75).  Since she has had her gallbladder removed, her liver began overproducing bile to the point that it has become toxic in her system; that is when she starts vomiting and having diarrhea (Tr. at 75).  Plaintiff has been to the emergency room repeatedly over the past year for this (Tr. at 74-75).  Plaintiff has been obese her entire life, even as a child (Tr. at 76).

**2.      Vocational expert testimony.**

Vocational expert Stella Doering testified at the request of the Administrative Law Judge.  Ms. Doering testified that a person would be unemployable if she would miss more than one day of work per month (Tr. at 80).  If the person had deficits in attention and concentration even for the performance of simple tasks for 2 1/2 hours per day, she would be unemployable (Tr. at 80).

*V.      FINDINGS OF THE ALJ*

Administrative Law Judge Deborah Van Vleck entered her opinion on September 7, 2012 (Tr. at 10-20).  Plaintiff's last insured date was December 31, 2010 (Tr. at 12).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 12).

Step two.  Plaintiff suffers from the following severe impairments:  bipolar disorder, post-traumatic stress disorder, cluster B personality traits, class III obesity with a weight range of 328 to 415 pounds on a 5' 5" frame for a body mass index of 55 to 69, sleep apnea, and dyspnea on exertion (Tr. at 13).

19

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13-14).  In determining that plaintiff's mental impairments do not meet or medically equal the criteria of listings 12.04 or 12.06, the ALJ found that plaintiff has only mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence or pace; and has experienced no episodes of decompensation (Tr. at 14).  The ALJ relied exclusively on the testimony of plaintiff's mother in making these findings (Tr. at 14).

Step four.  Plaintiff retains the residual functional capacity to perform light work except she is limited to occasional balancing, stooping, crouching, kneeling, crawling, and climbing ramps and stairs (Tr. at 15).  She is unable to engage in work involving ladders, ropes or scaffolding and should avoid concentrated exposure to pulmonary irritants such as fumes, dusts, odors and gases, and should avoid unprotected heights or hazardous machinery (Tr. at 15).  Plaintiff requires a sit-stand option and is limited to work involving tasks that can be learned in 30 days or less (Tr. at 15-16).  She is limited to work involving no more than simple work related decisions with few workplace changes and no work that is performed at production rate pace (Tr. at 16).  Plaintiff is limited to no more than occasional interaction with the public, coworkers or supervisors (Tr. at 16).

The ALJ mentioned plaintiff's psychiatric hospitalizations and her numerous attempts at suicide, only to point out that those records exist (Tr. at 17).  The ALJ mentions the medical opinions from plaintiff's treating physicians indicating that plaintiff's mental impairments would cause her to miss more than four days of work per

month (Tr. at 17). The ALJ afforded the opinions limited weight and "does not adopt them or find that the record supports a finding that the claimant's mental impairments impose such limitations that she is incapable of working." (Tr. at 17). The ALJ does not state why those opinions were given only limited weight except to say that they are inconsistent with the ALJ's residual functional capacity assessment. The ALJ gave limited weight to the opinion of Margaret Sullivan, Ph.D., finding that plaintiff had experienced three episodes of decompensation, each of extended duration, because the opinion was dated May 20, 2011, and there were other medical records after that date (Tr. at 18).

The ALJ found that plaintiff has no past relevant work (Tr. at 19).

Step five. Plaintiff can perform other jobs in significant numbers such as weight recorder, collator operator, or office helper (Tr. at 20). Therefore plaintiff is not disabled (Tr. at 20).

## VI. WEIGHT GIVEN TO TREATING SOURCES

Plaintiff argues that the ALJ erred in failing to afford controlling weight to plaintiff's treating physicians. The ALJ assigned limited weight to each of the treating source medical opinions from Dr. Ridley and Dr. Hassan, but afforded significant weight to the opinion of a state agency consultative examiner, Dr. Epperson, who only reviewed medical records from Two Rivers Hospital.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed

21

v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record.  20 C.F.R. §§ 404.1527, 416.927.

The ALJ had very little to say about the opinions of plaintiff's treating physicians:

Along with the mental health treatment notes are several medical opinions from treating physicians indicating that the claimant's mental impairments impose significant limitations, including missing more than 4 days of work per month, which prevent her from working.  Taking these opinions into consideration singly and in combination with each other, the undersigned affords them limited weight but does not adopt them or find that the record supports a finding that the claimant's mental impairments impose such limitations that she is incapable of working.  The record does establish mental limitations but fails to support the limitations opined by these treating physicians.

In addition to the treatment notes, the record also contains a consultative psychological examination report.  The examiner diagnosed the claimant as having bipolar disorder and post traumatic stress disorder.  In addition, she opined that the claimant would perform best in situations without public contact and where she does not have to exert a lot of physical energy.  This opinion seems consistent with the medical evidence documenting her physical and mental impairments and is afforded significant weight by the undersigned.

(Tr. at 18).

22

On June 24, 2008, Rick Thomas, Ph.D., found that plaintiff "has had severe problems with her Bipolar II Disorder. The disorder has caused her to take sudden trips, give away belongings and do some things other would consider bizarre." Dr. Thomas administered the Minnesota Multiphasic Personality Questionnaire II, Burns Intake Survey Parts I and II, the Shipley Institute of Living Scale; he interviewed plaintiff extensively; and he reviewed a "substantial number of documents" (Tr. at 319-327). Dr. Thomas was of the opinion that plaintiff needed extensive mental health treatment and was unable to sustain gainful employment.

On May 30, 2012, plaintiff's treating physician, Kirk Ridley, M.D., wrote the following:

> Amanda is a 25-year-old morbidly obese white female patient of mine who has been a patient of mine for years. Her major medical problems all relate to her bipolar-affective disorder and borderline personality disorder. She is on multiple medications and has seen multiple doctors for these diagnoses over the years. She has been in and out of emergency rooms almost on a weekly basis for months and months for one complaint after another. She has been admitted to the hospital for multiple suicide attempts or gestures over the years. She has a long psychiatric history of depression, mood swings and bipolar disease. After reviewing her chart and knowing her history as I do and with the fact that she has been through multiple modalities of therapy including medication and behavior therapy and counseling I see no way that this young lady will ever be able to hold a job of any sort. I hate to say that, but she has seen many good doctors and she has been on multiple medications and she continues with the same problems and behaviors. . . .

(Tr. at 1318).

In his treatment notes, Dr. Ridley noted on multiple occasions that plaintiff was having a difficult time managing her depression. She had uncontrolled diabetes, and Dr. Ridley remarked that her psychiatric medications were causing her blood sugar to be

elevated.  He noted that her medications were causing her to be fatigued to the point where she was unable to get through the day, and he provided her with prescription Nuvigil samples after her psychiatrist prescribed this medication that she could not afford.  Dr. Ridley had to try different diabetes medications as plaintiff was not able to tolerate several of them.  Her blood sugar continued to be well out of control despite using insulin and her weight continued to increase, prompting Dr. Ridley to refer plaintiff to an endocrinologist.  Plaintiff saw Dr. Ridley for migraine headaches, but because she was taking Lamictal for her psychiatric condition and had already tried Topamax, he had no other treatment to offer her and referred her to a neurologist.  Dr. Ridley had been consulted by emergency room personnel due to plaintiff's frequent emergency room visits because of migraine headaches.  Dr. Ridley treated plaintiff for numerous other conditions including pneumonia, lumps, rashes, intestinal problems, etc.

On June 19, 2012, Farah Hassan, M.D., plaintiff's treating psychiatrist, completed a Mental Impairment Questionnaire (Tr. at 1321-1324).  Dr. Hassan reported that plaintiff had a guarded prognosis due to her mental condition.  She suffered from Bipolar Mood Disorder and Borderline Personality Disorder.  Dr. Hassan found that plaintiff had a poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, decreased energy, manic syndrome,  hostility and irritability, pathological dependence or passivity, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, and generalized persistent anxiety. She found that plaintiff suffers from marked deficiencies of concentration, persistence or pace and has experienced three or more episodes of deterioration or

24

decompensation. Plaintiff was taking Lamictal, Abilify, Cymbalta and Seroquel for her mental condition. Dr. Hassan found that plaintiff's condition and treatment would result in her missing more than four days of work per month. She stated that plaintiff gets overwhelmed and cannot cope. This is despite her currently being in therapy and on her medications. Dr. Hassan's treatment records reflect that plaintiff continued to be volatile and needed close monitoring for mood swings and manipulative behaviors.

I find that the ALJ erred in failing to describe why she did not give controlling weight to the opinions of plaintiff's treating physician and treating psychiatrist. I further find that the substantial evidence in the record fails to support the ALJ's conclusion that plaintiff is not disabled. The opinions of plaintiff's treating physicians are consistent with the voluminous medical records and establish that plaintiff would likely miss more than one day of work per month due to her condition and treatment, and the vocational expert testified that such a person would be unable to engage in substantial gainful activity. The ALJ's finding that plaintiff's testimony and that of her mother is not credible is also not supported by the substantial evidence in the record.

## VII.    CONCLUSION

I find that the ALJ erred in finding plaintiff and her mother not credible and in failing to give controlling weight to the opinions of plaintiff's treating physicians. Therefore, based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled.

It is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits and a determination as to whether plaintiff is capable of handling her own funds.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 30, 2015